**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ricky Grover AARON Defendant–
Appellant.**

No. 00–6383.

United States Court of Appeals,
Sixth Circuit.

April 3, 2002.

Before MARTIN, Chief Circuit Judge; BOGGS and DAUGHTREY, Circuit Judges.

PER CURIAM.

Defendant Ricky Grover Aaron appeals the district court's partial denial of his motion to suppress child pornography obtained from his computer and the district court's refusal to allow Aaron to withdraw his guilty plea. We affirm.

## I.

Acting on a tip from a counselor at Vanderbilt Child Psychiatry Hospital, Detective Jeffrey Goodwin of the Metropolitan Nashville Police Department interviewed a fifteen-year-old girl who claimed Ricky Aaron had taken nude photographs of her in his office at the Revco drugstore in Donelson, Tennessee. The girl also alleged that Aaron showed her pictures of other naked girls, offered her pills to relax if she would have sex with him, and threatened her with a handgun.

After further investigation, Goodwin sought to interview Aaron's live-in girlfriend, Brandy Mayes. On July 29, 1998, Goodwin, along with Detective Harry Meek, pulled Mayes over in the Hickory Hollow Mall parking lot. After identifying himself, Detective Goodwin informed Mayes that she had not done anything wrong, that she was not under arrest, and that Aaron was the focus of the investigation. During the encounter, Mayes indicated she owned the home, that Aaron paid her rent and that she and Aaron shared a bedroom.

According to Mayes, the detectives acknowledged they did not have a search warrant, but stated that they could return any time, day or night, with a search warrant and kick the door down. Mayes testified that when she agreed to the search, she was angry at Aaron because she believed he had disposed of the child pornography and a little afraid.

In response to the detectives' request to conduct the search in Aaron's absence, Mayes asked Aaron to run an errand for her. After Aaron pulled away, the detectives entered the house and, according to their suppression hearing testimony, presented Mayes with a consent form. At this time, Detective Goodwin again ex-

plained to Mayes that she had not done anything wrong, that she was not under arrest, and that she did not have to sign the consent form.

After obtaining written consent, the detectives began examining Aaron's computer, which was located in an unlocked, spare bedroom. According to Detective Meek, the computer was not password-protected. Fifteen to twenty minutes later, Aaron arrived back at Mayes's home. At this point, the detectives had not located any child pornography.

Detective Goodwin informed Aaron that he was not under arrest, and did not have to speak with the detectives. According to both detectives, Aaron volunteered that he had some child pornography on the computer and verbally consented to a search of his computer. Aaron also signed the consent form.

According to Mayes, Aaron purchased the computer in question a few weeks prior to the search. Mayes indicated that she saw child pornography on Aaron's previous computer, which was also located in the spare bedroom. Mayes testified that she used Aaron's previous computer "pretty regularly," but was unfamiliar with the new computer's operating software—Windows 98. While she had not used the new computer, she had observed Aaron using it. On cross examination, Mayes indicated that Aaron would be angry if she had gone through his things.

At the suppression hearing, Aaron acknowledged the computer was not password-protected. He claimed Mayes did not know how to turn the computer on, and that he had not coached her on how to use it. He did not, however, tell her she could not use the new computer.

## II.

Aaron filed two motions to suppress, an initial motion challenging the admission of child pornography obtained from his computer, and a supplemental motion challenging the admission of statements he made to the detectives. The district court granted Aaron's motion with respect to zip cartridge files and Western digital hard drive files, but denied the motion regarding images seized from Aaron's general computer files. The district court reserved decision on Aaron's supplemental motion.

Aaron pleaded guilty to violations of the Child Protection Act, 18 U.S.C. 2252(a)(2) and 2252(a)(4)(B), on February 17, 2000. Among other provisions, the plea agreement contained a waiver of appeal provision limiting Aaron's appeal to claims of prosecutorial misconduct or ineffective assistance of counsel, upward sentencing departure or his Fourth Amendment claim. At the plea hearing, Aaron stated that he understood that the plea agreement did not preserve his supplemental suppression motion. Specifically, the district court conducted the following exchange with Aaron:

> Court: You are also preserving your right to appeal the denial of the Motion to Suppress, which is Docket Number 39, and we have had a discussion here, in your presence, that you're not preserving your right to appeal the motion that has not yet been ruled on, which deals with the Fifth Amendment *Miranda* issues. Do you feel understand that?
>
> Aaron: Yes, sir.

The district court appointed new counsel for Aaron on May 24, 2000 and on September 1, 2000, Aaron filed a motion to withdraw his guilty plea. The district court denied this motion and sentenced him to fifty-one months.

## III.

In reviewing a motion to suppress, we review the district court's findings of fact

for clear error and its conclusions of law *de novo*. *United States v. Crozier*, 259 F.3d 503, 510 (6th Cir.2001). Voluntariness of consent is a factual determination reviewed for clear error. *United States v. Worley*, 193 F.3d 380, 384 (6th Cir.1999).

### A.

■ The Fourth Amendment normally prohibits the warrantless search of an individual's home. *United States v. Haddix*, 239 F.3d 766, 767 (6th Cir.2001). "The prohibition does not apply, however, to situations, in which voluntary consent has been obtained, either from the individual whose property is searched ... or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Consent to search only vitiates the warrant requirement if consent was voluntarily given. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). When the validity of a warrantless search is based on consent, the government must show the consent was "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir.1992).

In assessing whether consent is voluntary, we examine several factors, including age, intelligence and education of the individual; whether the individual understands his or her right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention, and the use of coercive conduct by the police. *United States v. Riascos–Suarez*, 73 F.3d 616, 625 (6th Cir. 1996)

When they pulled Mayes over, the detectives reassured Mayes that she was not the focus of the investigation, that she was not under arrest, and that she had not done anything wrong. Although Mayes was somewhat frightened by the officers, when we view the entire encounter in context of the officers' statements, we cannot conclude the district court's finding of voluntariness was in error.

■ This court has held that an officer's statement that he or she will obtain a search warrant if the individual does not consent does not void an otherwise permissible consent search, provided the claim is neither baseless nor pretextual. *United States v. Salvo*, 133 F.3d 943, 954 (6th Cir.1998) (collecting cases). In light of this precedent, the officer's statement that they would return with a search warrant and kick the door down also does not vitiate the voluntariness of Mayes's consent.

### B.

■ Consent to search can be provided by a "third party who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Moore*, 917 F.2d 215, 223 (6th Cir.1990). In *Matlock*, the Supreme Court defined "common authority" as:

> [M]utual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock*, 415 U.S. at 171 n. 7.

In *Moore*, this court ruled that the defendant's girlfriend could authorize a search because she had common authority over the searched residence and she shared a bedroom with the defendant. *Id.*

at 223; *see also United States v. Clutter,* 914 F.2d 775, 778 (6th Cir.1990) (finding that teenage children demonstrated sufficient access and control over their parents's bedroom to authorize a search thereof). In light of these case, Mayes, as owner, occupant and co-habitant, plainly possessed actual authority to consent to a search of the house.

## C.

■ Authority to consent to a search of a residence is not necessarily co-extensive with authority to consent to a closed container stored in that area. *United States v. Karo,* 468 U.S. 705, 725–26, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (O'Connor, J., concurring); *United States v. Salinas–Cano,* 959 F.2d 861, 865 (10th Cir.1992). As we have observed, "courts are understandably reluctant to approve third-party consent searches of an enclosed space in which the family member targeted for the search has clearly manifested an expectation of exclusivity." *Clutter,* 914 F.2d at 778 (citations omitted).

In assessing whether a third-party's authority includes a particular container, courts typically examine the nature of the relevant container and any precautions taken to ensure privacy. *United States v. Basinski,* 226 F.3d 829, 834 (7th Cir.2000); *United States v. Welch,* 4 F.3d 761, 764 (9th Cir.1993); *United States v. Block,* 590 F.2d 535, 541 (4th Cir.1978); *see also United States v. Bivens,* No. 96–6622, 1999 WL 71596, at *4 (6th Cir. Jan. 22, 1999); *United States v. Jaras,* 86 F.3d 383, 389 (5th Cir.1996). Courts also consider "the consenting party's lack of interest in an item," *Salinas–Cano,* 959 F.2d at 864, and any visible markings on the container, *Basinski,* 226 F.3d at 835. In the personal computer context, courts examine whether the relevant files were password-protected or whether the defendant otherwise mani-

fested an intention to restrict third-party access. *Trulock v. Freeh,* 275 F.3d 391, 403 (4th Cir.2001) (ruling that a warrantless search of plaintiff's password-protected files violated his Fourth Amendment rights); *United States v. Smith,* 27 F.Supp.2d 1111, 1115 (C.D.Ill.1998) (holding that live-in girlfriend could consent to search of computer because (1) the computer was located in an accessible portion of the house; (2) the presence of children's toys located around the computer suggested other family members had access to the computer; (3) defendant's girlfriend was not prohibited from using the computer; and (4) the computer was not password-protected).

Although Aaron had a privacy interest in the computer akin to a suitcase or briefcase, the record does not contain any indication that Mayes could not access the computer. First, Aaron acknowledged that he never advised Mayes she could not use his computer. Second, Aaron did not protect his computer with a password or otherwise manifest an intention to restrict Mayes's access. On appeal, Aaron emphasizes that Mayes had not used the new computer. But because Aaron never told Mayes she could not use the new computer nor restricted her access with password protections, we cannot infer that Mayes's lack of use signaled lack of access. Additionally, we cannot conclude that the difference between Windows 98 and 95 was sufficiently substantial so as to effectively bar Mayes's access to the new computer.

## IV.

■ We review a district court's denial of a motion to withdraw a guilty plea for abuse of discretion. *United States v. Durham,* 178 F.3d 796, 798 (6th Cir.1999). Federal Rule of Criminal Procedure 32(e) provides—"[i]f a motion to withdraw a plea of guilty or *nolo contendre* is made before

sentence is imposed, the court may permit the plea to be withdrawn if the defendant shows any fair and just reason." The purpose of the rule "is to allow a hastily entered plea made with unsure heart and confused mind to be undone." *United States v. Alexander*, 948 F.2d 1002, 1004 (6th Cir.1991). The rule, however, was not designed as a tactical tool allowing a defendant "to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty." *Id.* (quoting *United States v. Carr*, 740 F.2d 339, 345 (5th Cir.1984)). Thus, the defendant must demonstrate a "fair and just reason" for withdrawal. *United States v. Bazzi*, 94 F.3d 1025, 1027 (6th Cir.1996).

In deciding whether a defendant has demonstrated a "fair and just reason," we consider: (1) the amount of time elapsed between the plea and the motion to withdraw; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) potential prejudice to the United States; and, (6) the defendant's prior experience with the criminal justice system. *Durham*, 178 F.3d at 798.

We have often relied on a defendant's delay in upholding a withdrawal denial. *Durham*, 178 F.3d at 798 (seventy-seven-day delay); *United States v. Baez*, 87 F.3d 805, 808 (6th Cir.1996) (sixty-seven-day delay); *United States v. Goldberg*, 862 F.2d 101, 104 (6th Cir.1988) (fifty-five-day delay); *United States v. Spencer*, 836 F.2d 236, 239 (6th Cir.1987) (thirty-five-day delay). Aaron waited one hundred ninety-six days after his guilty plea, to move for withdrawal. In effort to surmount this glaring delay, Aaron argues that his initial plea was due to the public defender's bad advice, and that the delay should be measured from the appointment of new counsel until filing. Even accepting these wholly conclusory allegations and affording Aaron the benefit of measuring delay from the appointment of new counsel, Aaron waited ninety-nine days to act. In light of this court's prior decisions, such delay essentially forecloses Aaron's claim.

Aaron's explanation for seeking to withdraw his plea is unpersuasive. According to Aaron, he was under the impression that the plea agreement would allow him to raise his Fifth Amendment suppression motion. But in reviewing the plea agreement with Aaron, the trial judge plainly advised Aaron that he could appeal the Fourth Amendment suppression motion, but that he could not appeal his Fifth Amendment suppression motion. When asked if he understood, Mr. Aaron replied that he did.

The remaining factors also support the district court's denial of the withdrawal motion. Aaron concedes he does not maintain that he is innocent. Additionally, allowing Aaron to withdraw the plea would prejudice the government by forcing it to prepare its case once again. Finally, Aaron's completion of college-level criminal justice classes indicates some familiarity with the criminal justice system. Therefore, it does not appear that Aaron has established a "fair and just reason" to allow him to withdraw his guilty plea.