# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 16, 2010 Session

## STATE OF TENNESSEE v. KENNETH WENDLAND

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-60686     David Bragg, Judge**

---

**No. M2009-01150-CCA-R3-CD - Filed January 31, 2011**

---

The defendant, Kenneth Wendland, entered a plea of guilty to aggravated sexual exploitation of a minor, a Class B felony, and criminal simulation, a Class E felony, but reserved a certified question of law pursuant to Rule 37. He received sentences of eight years for the Class B felony and one year for the Class E felony. The question reserved for review is whether the searches of the defendant's home and computers were illegal under both the United States and Tennessee constitutions. After careful consideration, we conclude that the searches at issue were legal.  Police were properly admitted into Mr. Wendland's house with the consent of his roommate.  While properly in the home, the officers legally seized evidence of counterfeiting, pursuant to the plain view doctrine.  Specifically, the officers had legal authority to seize certain computers, computer equipment, and other items as evidence because they had probable cause to believe that these items were involved in the production of counterfeit money. After these items were lawfully seized, the computers were properly searched pursuant to valid search warrants.  Consequently, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Brent O. Horst, Nashville, Tennessee, for the appellant, Kenneth Wendland.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Laural A. Hemenway, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case began when the Murfreesboro Police Department was notified that an individual had passed counterfeit ten-dollar bills at three McDonald's restaurants. Video obtained from one of the restaurants showed the defendant at the time of the crime, as well as a clear view of his license plate. All three counterfeit bills passed at the restaurants had identical serial numbers.

Members of the police department were dispatched to the defendant's residence. The defendant answered the door to his home and informed officers that he had a gun "on his side." The detectives patted down the defendant and removed a gun and a pocketknife. The defendant was then placed in the back of a patrol car. The defendant was *Mirandized*, and a detective explained to him that they were there because they had received information that he had passed counterfeit money.

The police returned to the residence and awoke the defendant's roommate. They sought and obtained his consent to search the common area of the residence. During the search, officers saw and later removed the following incriminating items: three computers, a printer, printing paper, a paper cutter, a ten-dollar bill found at the defendant's work station with the same serial number as the counterfeit bills passed at the McDonald's restaurants, a McDonald's sack, and a McDonald's receipt showing a "90-something cent" purchase paid for with a ten-dollar bill.

Detective Abbott, one of the officers conducting the search, explained during the motion to suppress why the incriminating nature of the items that the officers removed was immediately apparent to him when he first saw them. Based on an examination of the counterfeit bills they had obtained from the McDonald's restaurants, the police believed that all of these bills had been produced from a single ten-dollar bill, which had been scanned into a computer or copied on a printer. When they searched the house, the police saw what appeared to be the original ten-dollar bill (which was later copied to make the counterfeit ten-dollar bills), lying in plain view along with some other money on top of a computer work station in the common room of the defendant's home. There was no other visible manner of making counterfeit money in the home, other than the computers and printer/scanner that were seen in that common area. Consequently, the only logical conclusion he could reach when he saw the computers and printer/scanner was that they were the very instrumentalities that had been used to make the counterfeit copies of the ten-dollar bill that was found near them.

After the seizures, the defendant gave the police written consent to search his bedroom, where the police discovered a pipe bomb. Detective Abbott promptly contacted the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), who arrived upon the scene to provide assistance with the removal of the bomb. The ATF advised Officer Abbott

to secure a search warrant for the residence and the defendant's car. Judge Loughry, of the Rutherford County General Sessions Court, issued such a warrant, the first of three ultimately obtained by police in the case.

Later that evening, the defendant's computers were taken to the police department, and a second search warrant was obtained for the purpose of searching them for any files related to counterfeiting. In the course of searching the defendant's computers for evidence relating to counterfeiting, authorities stumbled across what appeared to be files containing child pornography. Authorities obtained a third search warrant, permitting them to search the computers for child pornography and, pursuant to this new warrant, found several suspicious files which did, in fact, contain child pornography.

On May 18, 2009, the defendant pled guilty to aggravated sexual exploitation of a minor and criminal simulation. His negotiated guilty plea reserved a certified question of law regarding the lawfulness of the search of his home and computers. This appeal followed.

Analysis

On appeal, the defendant has reserved a certified question of law in which he contends the trial court improperly denied his motion to suppress. In *State v. Preston*, 759 S.W.2d 647 (Tenn. 1988), our supreme court made explicit to the bench and bar exactly what the appellate courts require as prerequisites to the consideration of the merits of a certified question of law. These requirements are as follows:

> Regardless of what has appeared in prior petitions, orders, colloquy in open court or otherwise, the final order or judgment from which the time begins to run to pursue a [Tennessee Rule of Appellate Procedure] 3 appeal must contain a statement of the dispositive certified question of law reserved by [the] defendant for appellate review and the question of law must be stated so as to clearly identify the scope and the limits of the legal issue reserved. For example, where questions of law involve the validity of searches and the admissibility of statements and confessions, etc., the reasons relied upon by [the] defendant in the trial court at the suppression hearing must be identified in the statement of the certified question of law and review by the appellate courts will be limited to those passed upon by the trial judge and stated in the certified question, absent a constitutional requirement otherwise. Without an explicit statement of the certified question, neither the defendant, the State nor the trial judge can make a meaningful determination of whether the issue sought to be reviewed is dispositive of the case. . . . Also, the order must state that the certified question was expressly reserved as part of a plea agreement,

that the State and the trial judge consented to the reservation and that the State and the trial judge are of the opinion that the question is dispositive of the case. . . . No issue beyond the scope of the certified question will be considered.

*Id.* at 650 (emphasis added); *see also State v. Caldwell*, 924 S.W.2d 117, 118 (Tenn. Crim. App. 1995). Failure to properly reserve a certified question of law pursuant to *Preston* will result in the dismissal of the appeal. *State v. Pendergrass*, 937 S.W.2d 834, 838 (Tenn. 1996). Here, the defendant expressly reserved the following question:

whether the search of his home, and his computer were illegal violating the [Fourth], and [Fourteenth] Amendments to the Constitution of the United States of America, Article I, [section] 7 of the Constitution of the State of Tennessee, [Tennessee Code Annotated section] 40-6-105, and [Tennessee Rule of Criminal Procedure] 41, and whether the Trial Court erred in denying the Defendant's motion to suppress evidence seized by the State as a result of the searches.

Addressing this question under the stringent standards listed above, we must address two distinct issues: (1) whether officers lawfully searched the defendant's home; and (2) whether the officers lawfully searched his computers.

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, this court is not bound by the trial court's conclusions of law. *State v. Randolph*, 74 S.W.3d 330, 333 (Tenn. 2002). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. *Braziel v. State*, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975). Applying these standards to the record before us to answer the question reserved, we conclude that the search of defendant's house was lawful because of the consent to search the common area of the residence granted by the defendant's roommate. We also conclude the seizure of the defendant's computers to be legal as well, as the prior search of his home established, through items found in plain view, that the computers and printer to be seized were possible instrumentalities of a crime.

The Fourth Amendment to the United States Constitution grants the right to be secure from unreasonable searches and seizures and prohibits the issuance of warrants without probable cause. Article I, section 7 of the Tennessee Constitution is identical in purpose and intent to the federal Fourth Amendment. *State v. Troxell*, 78 S.W.3d 866, 870 (Tenn. 2002). Under both constitutions, a warrantless search or seizure is presumed to be unreasonable, and the resulting evidence is subject to suppression unless the State demonstrates the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

One such exception is a search conducted pursuant to a person's consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). To provide the basis of a lawful search, any consent given must be "unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *State v. Simpson*, 968 S.W.2d 776, 784 (Tenn. 1998) (quoting *State v. Brown*, 836 S.W.2d 530, 547 (Tenn. 1992)). Any consensual search must not exceed the scope of the consent given. *Troxell*, 78 S.W.3d at 871. To determine whether the scope of a search has exceeded the scope of the consent given, courts use an objective "reasonable person" standard, *see id.*, and any express or implied limitations regarding the time, duration, area, or intensity of police activity necessary to accomplish the stated purpose of the search are relevant considerations. *Florida v. Jimeno,* 500 U.S. 248, 251 (1991). The scope of consent given by a co-inhabitant may not exceed that of his or her authority over the property; however, such a co-inhabitant may give consent to search areas of common authority, meaning:

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974); *see also State v. Bartram*, 925 S.W.2d 227, 231 (Tenn. 1996).

Here, the trial court found the defendant's roommate gave valid consent to search the common areas of the house, which included the living room, where the officers observed some computers and a printer/scanner sitting out on a desk. Prior to the search, police were aware that the defendant had been identified, by his automobile license plate number and video tape, as a person who had passed a counterfeit ten-dollar bill at a McDonald's. Officers observed that a ten-dollar bill was lying on the living room computer work station and that the serial number of the bill matched that of the counterfeit currency passed at the McDonald's restaurants. In the garbage can, a McDonald's sack was found, containing a receipt showing that a purchase was paid for with ten dollars. Under the circumstances, the

criminal nature of these items, including the computers and the printer/scanner, would have been immediately apparent to any reasonable observer.

Over ten years ago, in a meeting of the United States House of Representatives, Subcommittee on Domestic and International Monetary Policy, Committee on Banking and Financial Services, it was observed that:

> We are here today because the Secret Service, the Treasury, and the United States of America are facing an alarming new challenge to the integrity of our national currency. Over the past two to three years, the face of counterfeiting has changed dramatically. The classic movie cliche of the ink-stained master engraver painstakingly touching up his counterfeit printing plates has now given way to amateurs, often suburban and teenaged computer hackers, or drug-dealing urban street gangs. The price of admission to commit the felony of counterfeiting has suddenly dropped from years of skilled apprenticeship and access to expensive professional printing equipment to anyone with the inclination, a personal computer and a color inkjet printer. All that is required to produce passable bills may be computer equipment no more advanced than what [forty] percent of American families already own, plus a printer that can be purchased for as little as $200.

*Counterfeiting Using Personal Computers: Before the Committee on Banking and Financial Services, Subcommittee on Domestic and International Monetary Policy,* 105th Cong. 1 (statement of Hon. Michael N. Castle, Chairman, S. Comm. on Dom. and Int'l Monetary Policy). In the ensuing years, technology has advanced further by leaps and bounds, and it has become practically common knowledge how little modern technology and specialized know-how is actually needed to commit serious financial crimes.

In this case, the officers, who were lawfully positioned to observe the computers and related items pursuant to the consent given to them to search the living room by defendant's roommate, were lawfully permitted not only to observe the items, but to actually seize them. *See* **Thomas K. Clancy, The Fourth Amendment: Its History and Interpretation** 305 (Carolina Academic Press 2008) ("[P]lain view doctrine differs from mere visual inspection from a lawful vantage point in that the officer is also in a lawful position to *seize* the object without an additional intrusion.") (emphasis in original). The defendant argues that there was no consent to search his personal desk area in the living room, as opposed to the living room itself, because the desktop was not an area of common authority. However, no additional consent was required when the seized objects were in plain view of officers lawfully positioned in the living room. Requiring these officers to simply freeze at the side of the desk upon viewing these items and to seek a warrant before proceeding further would "be impractical and do little to promote the objectives of the Fourth Amendment." *Id.*

(*quoting Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

There are a number of courts that have held that officers can seize computers under the plain view doctrine when the incriminating nature of the computer is immediately apparent. *See United States v. Phan*, 628 F. Supp. 2d 562, 572 (M.D. Pa. 2009) (finding that the incriminating nature of a computer was immediately apparent because computers often contain documents related to business, and the officers were investigating a claim of fraudulent business practices); *United States v. Rosario*, 558 F. Supp. 2d 723, 727-28 (E.D. Ky. 2008) (holding that the criminating nature of the computer was immediately apparent when officers had received reports that multiple people had viewed child pornography on the defendant's computer); *United States v. O'Brien*, 498 F. Supp. 2d 520, 545 (N.D. N.Y. 2007) (finding that officers had probable cause to seize computer under the plain view doctrine when officers were investigating a claim of inappropriate internet communication and computer appeared to be connected to the internet). Here, the incriminating nature of the defendant's computers and computer equipment would have been immediately apparent to any reasonable officer, in light of the circumstances that led up to the items being seen. No other means of making counterfeit money of the kind passed in this case was present in the home, except for the computers and other items seized by police. Reasonable officers would necessarily conclude under the circumstances that the computers at issue had, in fact, been used to create the counterfeit currency the defendant had recently passed.

Next, the defendant argues that the police did not have probable cause to conduct a further warrantless search of the internal files of the computers. The defendant argues that the fact that the computers were password protected indicates that the computers were not under the common authority of the roommate, and thus, any search of its internal files necessarily exceeded the power of his roomate's consent. *See United States v. Aaron*, 33 Fed. Appx. 180, 184 (6th Cir. 2002) (holding search valid under consent given by common authority where defendant's computers were *not* password protected against possible use by his live-in girlfriend). However, the defendant's argument on this issue is misplaced. This second internal search of the computers in question *was* conducted pursuant to a lawfully issued search warrant.

The defendant's argument to the contrary hinges on his assumption that the computers were initially seized under the authority of the *first* search warrant obtained by the police, which was subsequently found to be invalid. However, our review of the record leads us to the conclusion that the seizure of the computers were lawfully completed *before* the issuance of the first search warrant. Therefore, the first search warrant could not serve as the basis for the seizure of the computers nor does its subsequent invalidation somehow taint the issuance of the two search warrants that followed. Rather, these computers were seized by lawfully positioned officers pursuant to the plain view doctrine and, thereafter, searched internally pursuant to the second and third search warrants, which were lawfully issued.

Finally, the defendant argues that the second search warrant, dated April 20, 2007, and the third search warrant, dated May 15, 2007, were issued pursuant to false and misleading statements and, therefore, should be suppressed. The defendant also contends that the first search warrant, having been declared invalid on a procedural ground, so taints the issuance of the second and third warrants as to make them invalid. We note our earlier ruling above in which we concluded that the search and seizure of the computers initially were not pursuant to the first warrant issued but, rather, seized lawfully under the doctrine of plain view.

The defendant's argument that the second and third warrants were products of false and misleading statements concerns statements in the affidavits for their issuance that reference the fact that an earlier search warrant had been issued. The statements contained in the affidavits for the second and third warrants were essentially that the computers were in custody of the police pursuant to "a lawfully issued search warrant." We acknowledge that the trial court found the first warrant invalid. We conclude, however, that the police officer statements contained in the two additional affidavits were superfluous and did not amount to false or misleading statements.

Conclusion

Based on the foregoing and the record as a whole, we affirm the defendant's convictions.

_____
JOHN EVERETT WILLIAMS, JUDGE