FILED
United States Court of Appeals
Tenth Circuit

November 23, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CHRISTOPHER MICHAEL BASS,

Defendant - Appellant.

No. 10-1461

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:09-CR-00230-DME-1)**

---

John F. Sullivan, III, The Law Office of John F. Sullivan, III, P.C., Denver, Colorado, for Defendant - Appellant.

Andrew A. Vogt, Assistant United States Attorney, (John F. Walsh, United States Attorney, with him on the brief), Denver, Colorado, for Plaintiff - Appellee.

---

Before **KELLY**, **MURPHY**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

A jury of the United States District Court for the District of Colorado

convicted Defendant Christopher Bass on one count of being a felon in possession

of a firearm. *See* 18 U.S.C. § 922(g)(1). He was sentenced to 94 months in

prison and 3 years of supervised release. On appeal he contends (1) that the search that discovered the firearm was unlawful because (a) the government failed to show that his girlfriend's consent to search his trailer was voluntary and (b) his girlfriend lacked authority to consent to the search of a zipper bag in the trailer; (2) that his sentence violates the Sixth Amendment because he received Sentencing Guidelines offense-level enhancements for alleged misconduct that he was acquitted of by the jury; and (3) that the evidence was insufficient to sustain the conviction. We have jurisdiction under 28 U.S.C. § 1291 and affirm.[1]

## I. BACKGROUND

### A. The Investigation

We take our factual summary from the evidence at the pretrial hearing on Defendant's motion to suppress.

Upon receiving a tip, Colorado Springs Police Officers Jessica Kundert and Shane Alvarez set up surveillance of Defendant's residence shortly after 1:00 p.m. on February 25, 2009. During their surveillance they observed a male, later identified as Defendant, leaving the area in a vehicle. They also observed a woman exiting the residence with what appeared to be personal belongings and putting them in a car trunk, although she did not leave the area. The officers

---

[1] Defendant's reply brief claims that there was insufficient evidence of his prior conviction, but we do not address this claim because it was not raised in the opening brief. *See United States v. Murray*, 82 F.3d 361, 363 n.3 (10th Cir. 1996) ("We decline to consider arguments raised for the first time in a reply brief.").

followed Defendant. After events not relevant on appeal, officers arrested Defendant for possessing drug paraphernalia, searched his vehicle incident to the arrest, found methamphetamine inside the vehicle, and took Defendant to the police station.

Officers Kundert and Alvarez returned to the trailer at 3:00 p.m. to investigate further. When they knocked on the door, Jessica Ramsey (the woman whom they had observed earlier) answered, stepping outside to talk to them on the front porch. She told the officers that she lived in the trailer with her boyfriend, Christopher. She had used methamphetamine the previous evening and earlier that day, but she did not appear to be under the influence. Although she testified that she sometimes had difficulty deciding whether she was high or "normal," she said that she was not high when the officers were there. R., Vol. 1 pt. 3 at 149.

Ms. Ramsey was initially hesitant to talk with the officers. She said that she needed to speak with the homeowner, and tried to call Defendant. The officers informed her that he was in custody. She became upset and began crying. But she told the officers that she was relieved because Defendant had been verbally abusing her, and she referred to the officers as angels.

The officers told her that they had found Defendant with drugs and a weapon (which was untrue—no weapon had actually been discovered) and that they wanted to search the residence for anything illegal. Officer Alvarez asked

Ms. Ramsey if there was anything illegal in the residence. She said that she did not know, but that Defendant sometimes hid things.

At various times before the hearing, Ms. Ramsey had given conflicting statements about what happened next, but the district court ultimately credited her testimony (1) that she initially refused consent to a search, but when she learned that Defendant was in custody, she started to cooperate with the officers; and (2) that while she and the officers were still talking on the porch, she orally consented to their request to search the entire trailer for illegal items. The officers did not immediately give Ms. Ramsey the written consent form because it was in the officers' vehicle and because she was upset. After the officers started searching, they explained the written consent form to her and she signed it. Based on his initial observations inside the trailer, Officer Alvarez asked for assistance, and several other officers arrived to join the search. During the search Ms. Ramsey provided information about firearms and drugs that she had seen in the trailer, and she told the officers that Defendant stored firearms in black bags, satchels, or backpacks. Officer Alvarez found a black leather zipper bag in the living room. Upon opening it, he found a revolver, a computer, a digital scale, an adult magazine, and CDs. He did not ask Ms. Ramsey who owned the bag before opening it.

Ms. Ramsey also told officers that Defendant stored firearms in a neighbor's shed. The neighbor took the officers to the shed and unlocked it for them. Inside the shed was a long plastic rifle case, which contained two rifles.

## B.   Judicial Proceedings

Defendant was charged with two counts of being a felon in possession of a firearm, *see* 18 U.S.C. § 922(g)(1)—one count for the revolver found in the bag, and one count for the two rifles found in the shed. Defendant moved to suppress much of the evidence, including the revolver found in the black bag. The district court denied the motion. With regard to the revolver, it ruled that Ms. Ramsey's consent to search was voluntary and that she had actual and apparent authority to consent.

The jury found Defendant guilty on Count One (the revolver) but not guilty on Count Two (the two rifles). In computing Defendant's offense level under the Sentencing Guidelines, the district court began with a base offense level of 14, *see* USSG § 2K2.1(a)(6), and added a 2-level enhancement for possession of three or more firearms, *see id.* § 2K2.1(b)(1)(A), a 2-level enhancement because a firearm was stolen, *see id.* § 2K2.1(b)(4)(A) and a 4-level enhancement for use or possession of a firearm in connection with another felony offense, *see id.* § 2K2.1(b)(6), resulting in a total offense level of 22. Given Defendant's criminal-history level of VI, his guideline sentencing range was 84-105 months. *See id.* ch. 5, pt. A. The court imposed a sentence of 94 months.

## II.    ANALYSIS

### A.    The Search

The Fourth Amendment generally prohibits a police officer from searching a home without a warrant. *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). A warrantless search may be valid, however, if the officer has the voluntary consent of either the owner or a third party with actual or apparent authority. *See id.* at 181, 186–89. The government in this case relies on the consent of Ms. Ramsey to justify the search of Defendant's trailer.

Defendant challenges the search on the grounds that Ms. Ramsey's consent was not voluntary and that she lacked authority to consent to the search of the bag in which the firearm was found. "When reviewing a district court's denial of a motion to suppress, [we] consider the totality of the circumstances and view[] the evidence in the light most favorable to the government." *United States v. Andrus*, 483 F.3d 711, 716 (10th Cir. 2007). "We accept the district court's factual findings unless they are clearly erroneous." *Id.* "Consideration of witness credibility, the weight given to evidence, and reasonable inferences drawn from evidence are within the district court's province as the fact-finder." *Id.* The validity of consent is reviewed de novo. *See id.*

Although Defendant raises some arguments based on evidence elicited at trial, we will consider only the evidence before the district court at the suppression hearing. Because "the district court should have the first opportunity

to correct its mistake," we ordinarily "will not consider trial evidence which undermines a district court decision rendered at a pretrial suppression hearing." *United States v. Parra*, 2 F.3d 1058, 1065 (10th Cir. 1993). The district court may consider trial testimony if the defendant renews the suppression motion at trial*, see id.*, but the court ordinarily need not do so if counsel fails to alert the court to how the evidence has been altered or supplemented at trial and why the change would affect the ruling. Absent exceptional circumstances that would justify relief for plain error, the court has no responsibility on its own to compare trial evidence with the evidence at the hearing and then analyze whether its prior ruling should stand. *See id.*; *United States v. Humphrey*, 208 F.3d 1190, 1204 (10th Cir. 2000) (if trial testimony would support a different legal justification for suppressing evidence, the defendant must inform the trial court of that new justification in renewing suppression motion at trial); *cf. United States v. Burke,* 633 F.3d 984, 987–88 (10th Cir. 2011) (failure to include a particular argument in a pretrial suppression motion waives the argument on appeal); *Sorensen v. City of Aurora*, 984 F.2d 349, 355 (10th Cir. 1993) (failure to raise specific objection to district court's exclusion of evidence precluded review on appeal).

In this case Defendant renewed his motion twice at trial but the renewals were perfunctory. *See, e.g.*, R., Vol. 2 pt. 2 at 285 ("I would like to renew that objection, your Honor, and ask that the Court reconsider the admission of the firearms."). Defendant did not so much as hint that he believed he had a ground

for suppression that had not been fully vetted at the suppression hearing.  The renewals of Defendant's motion at trial therefore can be ignored on appeal, and Defendant does not (and could not) argue plain error.[2]  Thus, we address only the record from the suppression hearing, as we now turn to Defendant's two challenges to the validity of Ms. Ramsey's consent.

### 1.    Voluntariness

Whether consent was voluntary is a question of fact based on the totality of the circumstances.  *See United States v. Silva-Arzeta*, 602 F.3d 1208, 1214 (10th Cir. 2010).  Defendant points to several circumstances that, in his view, demonstrate involuntariness:  Ms. Ramsey initially refused consent to the search; she was upset; she feared getting in trouble if she did not cooperate; she had used methamphetamine earlier that day; she had made several inconsistent statements about her consent; and the officer falsely told her that Defendant had been found with a gun.

---

[2]We further note the special difficulties that arise when a motion to suppress is renewed at trial.  If the motion is granted during trial, the government cannot appeal, *see United States v. Brooks*, 438 F.3d 1231, 1240 (10th Cir. 2006), so it should ordinarily be granted only postverdict (assuming a conviction). *See United States v. Morrison*, 429 U.S. 1, 3–4 (1976) (government may appeal postconviction order suppressing evidence because no further factual proceedings relating to guilt or innocence would be required if the denial were reversed). We need not decide whether the Federal Rules of Criminal Procedure (particularly Fed. R. Crim. P. 12(b)(3)(C)) permit the renewal at trial of a pretrial motion to suppress.

The district court, however, could properly view the evidence differently and draw different inferences. It found that Ms. Ramsey was initially hesitant to talk to the officers but that this hesitancy ended when she learned that Defendant was in custody, which comforted her that he would not later return to repeat his abuse. The court recognized that Ms. Ramsey was emotional, but found that she was relieved by what the officers told her and that the general tone of the encounter was positive. Regarding her use of methamphetamine, the court noted that she had not smoked that afternoon, she did not think she was high, and she appeared to understand what she was consenting to. The court found further support for the voluntariness of the consent from her remaining with the officers in the trailer during the search, her providing additional information to them during the search, and her signing a written consent form. It also noted that the officers did not draw their guns or raise their voices. And although Defendant emphasizes evidence indicating Ms. Ramsey's lack of credibility, the district court could rationally credit her testimony. *See Andrus*, 483 F.3d at 716 (witness credibility is a matter for the fact-finder). The court did not specifically address Defendant's concern that the officers falsely told Ms. Ramsey that he had been found with a weapon, but Defendant has not argued why that false statement would have influenced Ms. Ramsey's decision whether to grant consent.

Viewing the evidence in the light most favorable to the government and considering the totality of the circumstances, we hold that the district court's finding of voluntary consent was not clearly erroneous.

## 2. Authority to Consent

The district court concluded that Ms. Ramsey had both actual and apparent authority to consent to the search of the bag containing the firearm. We hold that Ms. Ramsey had apparent authority to consent to the search. Hence, we do not need to decide whether she had actual authority. But because apparent authority exists when the officer reasonably believes that the consenter has actual authority to consent, *see Rodriguez*, 497 U.S. at 186, 188, we must discuss the nature of actual authority to assess apparent authority.

One has authority to consent if she "possess[es] common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974).

> Common authority . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* n.7; *accord Rodriguez*, 497 U.S. at 181. Common authority over a residence does not necessarily imply common authority over all locations or objects within the residence. *See Georgia v. Randolph*, 547 U.S. 103, 112 (2006) ("[W]hen it

comes to searching through bureau drawers, there will be instances in which even a person clearly belonging on premises as an occupant may lack any perceived authority to consent."). But a court will not "engage in . . . metaphysical subtleties" in determining the boundaries of common authority. *Frazier v. Cupp*, 394 U.S. 731, 740 (1969). In *Frazier* the defendant and his cousin jointly used a duffel bag that had been left in the cousin's home. *See id.* The Court upheld the cousin's authority to consent to a search of the entire duffel bag, rejecting as irrelevant the defendant's claim that his cousin had actual permission to use only one compartment in the bag. *See id.*

Here, the officers were reasonable in believing that Ms. Ramsey was a joint occupant with common authority over the premises. They saw her at the trailer during their original surveillance before apprehending Defendant. When they returned to the residence less than two hours later, Ms. Ramsey answered the door. They talked to her for 10 to 15 minutes, during which she told them that she lived there with her boyfriend, Christopher. Defendant argues that the officers should have questioned whether she was a permanent resident because they saw her putting "belongings, clothing, [and] things of that nature" in her car during their original surveillance. Aplt. Br. at 16 (quoting from Rep.'s Tr. Mot. [to Suppress] Hr'g at 48, R., Vol 1 pt. 2 at 417). But before the officers entered the trailer, she had told them that she kept personal items, personal hygiene items, and clothing in the trailer. In our view, she had told the officers enough to show

an intimate relationship closely akin to that of a husband and wife for purposes of assessing common authority. *See United States v. Penney*, 576 F.3d 297, 308 (6th Cir. 2009) ("We have confirmed a number of times that a live-in girlfriend has common authority over the premises wherein she cohabits with a boyfriend," even though in the case at hand "the relationship was known to be turbulent and the couple did not cohabit uninterruptedly.").

Defendant further contends that officers should have investigated further because of Ms. Ramsey's emotional state and her initial refusals to give consent. We disagree. Although her emotional state and initial refusals might be relevant to whether consent was voluntary, Defendant does not explain why these circumstances undermine her apparent authority. We are also unpersuaded by Defendant's argument that Ms. Ramsey's lack of credibility defeats the officers' reasonable belief in her authority. After all, the district court ultimately found her testimony credible—ample support for its implicit finding that the officers could have reasonably credited what she said.

Defendant's best argument is that even if Ms. Ramsey had common authority over the trailer, she lacked authority to consent to a search of the bag containing the gun. But we reject this argument as well. The bag was a zipper bag lying on the living room floor next to the couch, hardly an object shouting "Do Not Enter." In light of the relationship between Defendant and Ms. Ramsey, the officers could reasonably believe that he had "assumed the risk," *Matlock*, 415

U.S. at 171 n.7, that she might look in the bag for missing items (such as a computer, a magazine, a CD, or even a gun) or, more pertinent to our case, allow someone else to examine the contents. As *Frazier* teaches, when general authority is present, we should not look for "metaphysical subtleties" to define the boundaries of that authority. 394 U.S. at 740. A leading treatise makes that point as follows:

> *Frazier* intimates that under the assumption of risk portion of the *Matlock* formula the risk may extend somewhat beyond that portion of the premises which by practice or agreement the other occupant generally uses. A protected expectation of privacy may exist where the defendant has taken some special steps to protect his personal effects from the scrutiny of others, but does not unquestionably exist where the co-occupant has ready access (perhaps not theretofore exercised) to the place searched.

4 Wayne R. LaFave, Search and Seizure § 8.3(f), at 168–69 (4th ed. 2004) (footnotes omitted). Defendant certainly took no "special steps" to protect the bag from scrutiny.

These considerations have special weight in the context of two persons living together in an intimate relationship. Such a relationship bespeaks a significant sacrifice of individual privacy. As the same treatise states:

> [T]he question is not whether the object seized was a personal effect of the nonconsenting spouse, but rather whether the object was kept in a place devoted to his exclusive use. Where, for example, the husband places a medical kit on an open pantry shelf, the wife may consent to a search of the kit notwithstanding the fact it is a personal possession of the husband purchased by him with his own money for his own use, and this is so whatever the husband's subjective expectations as to his exclusive use of the medical kit.

-13-

*Id.* at 194 (footnote and internal quotation marks omitted).

The principal opinion relied on by Defendant, *United States v. Salinas-Cano*, 959 F.2d 861 (10th Cir. 1992), does not persuade us otherwise. In that case we held that the lessor of an apartment lacked authority to consent to the search of the suitcase of a boyfriend who spent about two nights a week there. *See id.* at 865. But the officers in that case knew that the suitcase belonged to the defendant alone. *See id.* And, more importantly, the couple, by spending five nights a week in separate residences, had shown that at least one of them desired her (or his) "space" and the resulting privacy. Thus, the court analyzed that case as a typical one in which a host was consenting to the search of an object owned by a guest. *See, e.g.*, *id.* at 863 (citing standard for host to consent to search of guest's private container). The guest/host relationship is far different from that of a couple living together in an intimate relationship.

The more pertinent precedent of this court is *White v. United States*, 444 F.2d 724 (10th Cir. 1971). The search took place in a motel room occupied by a man and woman holding themselves out as husband and wife. Although the defendant acknowledged that his girlfriend could consent to the search of the room, he argued that she lacked authority to consent to the search of a cloth zipper bag in the room, which contained, among other things, travelers checks and false identification used as evidence against him. *See id.* at 725–26. We disagreed, specifically distinguishing a case involving the search of the

belongings of an overnight guest, *see United States v. Poole*, 307 F. Supp. 1185 (E.D. La. 1969), and noting that the girlfriend had been left "in complete charge of the motel [room] and its contents, that she held herself out as his wife to the officers, and that she neither objected to the search of the bag nor indicated to them in any way that it was exclusively appellant's property," *White*, 444 F.2d at 726. As in *White*, the officers here were reasonable in believing that Ms. Ramsey had the requisite authority over an unlocked bag in the common area.

B.     **Enhanced Sentence for Acquitted Conduct**

Defendant contends that it was improper for the district court to increase his offense level based on his possession of firearms found in his neighbor's shed because the jury acquitted him of the charge of possessing those firearms. He concedes that under *United States v. Watts*, 519 U.S. 148 (1997), there is no double-jeopardy impediment to a sentencing judge finding a fact by the preponderance of the evidence even though the jury was not convinced beyond a reasonable doubt. But he argues that "relying on acquitted conduct violated the Sixth Amendment right to a jury trial." Aplt. Br. at 28.

We disagree. The Sixth Amendment right to a jury trial is not implicated by judicial fact finding under a discretionary sentencing regime. *See Rita v. United States*, 551 U.S. 338, 352 (2007) (Sixth Amendment is violated by increase in sentence based on judicial fact finding only if the governing law "*forbids* a judge to increase a defendant's sentence *unless* the judge finds facts

that the jury did not find (and the offender did not concede).").  "[W]hen a district court makes a determination of sentencing facts by a preponderance test under the now-advisory Guidelines, it is not bound by jury determinations reached through application of the more onerous reasonable doubt standard."  *United States v. Magallanez*, 408 F.3d 672, 685 (10th Cir. 2005) (rejecting Sixth Amendment claim).

### C.    Sufficiency of the Evidence

Finally, Defendant challenges the sufficiency of the evidence, arguing that most of the evidence tying Defendant to the handgun came from Ms. Ramsey, who lacks credibility.  "We review sufficiency of the evidence challenges *de novo*, viewing the evidence in the light most favorable to the government."  *United States v. Parada*, 577 F.3d 1275, 1283 (10th Cir. 2009).  "We reverse only if no rational jury could have found each element of the crime beyond a reasonable doubt."  *Id.*  In particular, credibility determinations are the province of the jury and are "virtually unreviewable on appeal."  *United States v. Virgen-Chavarin*, 350 F.3d 1122, 1134 (10th Cir. 2003) (internal quotation marks omitted).  An appellate court can disregard a witness's testimony only if "it is unbelievable on its face"—that is, if it asserts "facts that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature."  *Id.* (internal quotation marks omitted).  That not being the situation here, we reject Defendant's argument.

## III. CONCLUSION

We AFFIRM the judgment of the district court.