**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 6, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>PUBLISH</u>

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MICHAEL JOSEPH DIAS,

    Defendant - Appellant.

No. 25-6028

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:24-CR-00188-HE-1)**

_____

Lynn C. Hartfield, Law Office of Lynn C. Hartfield, LLC, Denver, Colorado, for Defendant-Appellant.

Tanner Larkin, United States Department of Justice, Washington, D.C. (Robert J. Troester, United States Attorney, Office of the United States Attorney, Oklahoma City, Oklahoma, with him on the brief), for Plaintiff-Appellee.

_____

Before **PHILLIPS**, **McHUGH**, and **EID**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

    Defendant-Appellant Michael Joseph Dias appeals his conviction and 120-month sentence under 18 U.S.C. § 922(g)(1) for possessing ammunition as a felon.

One morning in 2024, B.A.[1] came home to find Mr. Dias, a stranger, inside his apartment. After an initial struggle, B.A. chased Mr. Dias outside. According to B.A., Mr. Dias pulled a gun and fired one or two shots at him. Mr. Dias then fled the scene and was arrested after a lengthy foot chase. Officers never recovered a firearm, but they found one shell casing in front of B.A.'s apartment building.

After a two-day trial, a federal jury convicted Mr. Dias of possessing ammunition as a felon in violation of 18 U.S.C. § 922(g)(1). The U.S. Sentencing Commission Guidelines range for the crime was 63 to 78 months' imprisonment. The district court varied upward from the Guidelines range and imposed a sentence of 120 months.

Mr. Dias challenges both his conviction and sentence. First, he argues the district court abused its discretion by admitting evidence of his prior conviction for being a felon in possession of a firearm. Second, he challenges the sufficiency of the evidence supporting his conviction. Third, he disputes the substantive reasonableness of his sentence. Fourth, and finally, he argues that § 922(g)(1) is facially unconstitutional under the Second Amendment to the United States Constitution. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[1] We refer to the victim by his initials.

## I.    BACKGROUND

### A.    *Factual History*[2]

On the morning of April 2, 2024, B.A. left his apartment in Oklahoma City, Oklahoma, locking his front door on his way out. He returned home about an hour later to find his front door unlocked and being held shut by someone on the other side. After a brief struggle, B.A. forced his door open and entered his apartment. He found a stranger inside whom he later identified as Mr. Dias. As B.A. entered the apartment, Mr. Dias started running up the stairs leading to the rest of the apartment. B.A. pulled him down, and they "tussle[d] a little bit." ROA Vol. 3 at 32. B.A. then pulled out his cellphone and started recording the encounter.

When the cellphone video started recording, Mr. Dias was standing with his back to the door, carrying a backpack and a large yellow toolbox. B.A. told Mr. Dias to leave his home immediately, accusing him of "moving too slow" and repeatedly warning him that he needed to "get out" and "hurry the f** up before I kill you." Suppl. ROA Vol. 1, Ex. 3 at 0:00–0:55. Mr. Dias remained in the same place, slowly gathering his belongings as B.A., becoming increasingly upset, continued to demand he leave. At one point, Mr. Dias said, "I didn't break into your house," to which B.A. responded, "I know, but n** you shouldn't'a walked in." *Id.* at 0:49–0:55. At this

---

[2] "We recite the facts in the light most favorable to the government, and we focus only on the evidence presented to the jury." *United States v. Goldesberry*, 128 F.4th 1183, 1185 n.2 (10th Cir. 2025) (internal quotation marks omitted).

point, B.A. was audibly agitated and started yelling at Mr. Dias and striking him with his hands.

Mr. Dias then exited the home. B.A. followed him outside, continuing to record the encounter. The video shows Mr. Dias walking backward and B.A. following him, as the two men continued shouting at each other. Mr. Dias said, "I didn't break into your house," to which B.A. responded, "You was in there motherf**er, wasn't you?" *Id.* at 1:15–1:22. Shortly after that, B.A. said, "I'm fixing to walk you down," and Mr. Dias responded, "I'm going to walk you down." *Id.* at 1:24–1:28. The video then abruptly cut away and ended.

B.A. later recounted that in that moment, Mr. Dias pulled a gun from his right side. In response, B.A. "took off running." ROA Vol. 3 at 34. He first sheltered behind a nearby car and then ran toward his apartment. Mr. Dias followed him. As B.A. ran toward his home, he heard Mr. Dias fire one or two gunshots behind him. After that, he saw Mr. Dias run away from the apartment complex.

B.A. reentered his home unharmed and called 911. He told the dispatcher, "Somebody just broke into my house; he shot at me . . . He missed." Suppl. ROA Vol. 1, Ex. 1, at 0:00–0:09. He then gave a physical description of the shooter. He explained that he found the shooter in his apartment and followed him outside, and the shooter "upped the gun on [him]." *Id.* at 1:22–1:35. B.A. added that he "just wanted to report the incident just in case one of my neighbors called up and said I was over here shooting. I didn't shoot at him; he shot at me." *Id.* at 1:55–2:01. He

told the operator, "I don't got no gun. I'm supposed to be on my way to work." *Id.* at 2:02–2:05.

Oklahoma City Police Master Sergeant Christopher Howard responded to the call. When he arrived at B.A.'s home, B.A was standing outside with his hands in the air, and he told Sergeant Howard that he was the one who called the police. B.A. began describing what happened and showed Sergeant Howard the video he recorded on his cellphone. Sergeant Howard's body camera captured their interaction. In the video, B.A. explains that when he came home, he discovered he could not get into his apartment; he then forced the door open, resulting in some damage to the frame. Sergeant Howard asked B.A. if he had any weapons on him, and B.A. responded that he did not, lifting up his shirt to show his waistband.

Sergeant Howard then asked "[w]here did he shoot at?" Suppl. ROA Vol. 1, Ex. 2 at 2:45–2:47. B.A. gestured toward the grassy area next to the parking lot and said, "I believe it was still like right here in the grass, so I see him pulling out the gun, I backed up and started running." *Id.* at 2:47–2:53. Sergeant Howard started searching the grassy area with a flashlight. Finding nothing, Sergeant Howard started searching the parking lot area in front of B.A.'s apartment building.

While Sergeant Howard searched the parking lot, he asked B.A. what the gun looked like. B.A. described it as, "probably a nine [millimeter], black" and "maybe MMP, Smith & Wesson, something like that." *Id.* at 3:03–3:11. Shortly after that, a neighbor can be heard on the video saying something from inside the apartment building. Sergeant Howard asked the neighbor if she had heard the shooting, and her

response is inaudible on the recording. Shortly afterward, she said something else that is unintelligible, and B.A. responded: "No, he shot at me miss, I didn't shoot at nobody, he broke into my house, I caught him in my house." *Id*. at 4:34–4:45.

After several minutes of searching, Sergeant Howard found a nine-millimeter shell casing on the ground in front of the unit two doors to the right of B.A.'s apartment. When Sergeant Howard found the casing, B.A. said "that's where, that's 'cause I was running when he shot." *Id.* at 4:25–4:30. The shell casing had no tarnishing or discoloration and appeared to have been recently fired. Later investigation revealed that no other firearm-related incidents in B.A.'s apartment complex or immediate area had been reported to the police in the six months leading up to the incident.

Meanwhile, other police officers searched the surrounding area for Mr. Dias. After spotting the officers, Mr. Dias fled on foot through a drainage ditch. He eventually climbed up into the backyard of a house where officers, aided by a K-9 unit, arrested him. When he was arrested, Mr. Dias no longer had the toolbox or backpack on his person, but officers later recovered a backpack and toolbox resembling the ones in the video. The backpack contained a wallet with Mr. Dias's identification, some women's clothing, a liquor bottle, and some electronics. Officers did not recover a firearm.

### B.    *Procedural History*

On May 7, 2024, a federal grand jury returned an indictment charging Mr. Dias with one count of possessing ammunition with knowledge that he had

previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). Mr. Dias

pleaded not guilty and proceeded to a jury trial.

### 1.    Pretrial Motion

Before his trial, the Government filed a notice of intent to introduce evidence

of Mr. Dias's 2019 conviction for being a felon in possession of a firearm under

Federal Rule of Evidence 404(b). It argued that the prior conviction was admissible

under Rule 404(b) to prove intent, knowledge, identity, absence of mistake, or lack of

accident. Mr. Dias objected and filed a motion in limine to exclude the evidence of

his prior conviction. He argued that the prior conviction was not relevant to showing

knowledge because Mr. Dias's knowledge of the firearm was not at issue in this case.

He also argued that the conviction's probative value would be substantially

outweighed by its prejudicial effect.

After a hearing on the motion, the district court denied Mr. Dias's motion to

exclude the prior conviction evidence, ruling that the evidence was admissible to

prove Mr. Dias's knowledge. The court stated that it would give a limiting instruction

to the jury upon Mr. Dias's request.

### 2.    Trial

At trial, the Government called B.A. as its first witness. B.A. testified that he

observed Mr. Dias pull a gun and discharge it after B.A. chased Mr. Dias out of his

house. The Government played B.A.'s cellphone video of his encounter with

Mr. Dias for the jury.

Next, the Government called Sergeant Howard, who testified about his investigation of the crime. The Government played the body camera video showing Sergeant Howard's initial search of the premises for the jury. Sergeant Howard testified that he found the shell casing in the parking lot at the bottom of the steps to Unit 4, two doors to the right of B.A.'s unit. He testified that because shell casings are typically ejected out of the right side of a firearm, the gun was likely pointed toward B.A.'s apartment at the time it was fired based on the location where the shell casing was found.

The Government later called Brian Anderson, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") as a witness. Agent Anderson explained that the shell casing that Sergeant Howard found on the ground was considered a round of ammunition. He also testified, consistent with Sergeant Howard's testimony, that when a gun is fired, the casing is usually ejected from the right side of the firearm. He explained that when a gun is discharged a casing might fall "immediately to [the] right" of the shooter or "as far as 5 to 10 feet away from where" the shooter was standing. ROA Vol. 3 at 105. But he noted that "[t]here's no way" to know with certainty where the gun was fired based on the location where the shell casing was found. *Id.*

The Government's final witness was Christopher Grimes, a detective for the Oklahoma City Police Department and a task force officer for ATF, who investigated whether the incident qualified as a federal crime. Detective Grimes testified that Mr. Dias was convicted of being a felon in possession of a firearm in 2019.

8

After the Government rested, Mr. Dias moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal. The district court denied the motion, and Mr. Dias did not present a defense case. The jury found Mr. Dias guilty.

## 3.    Sentencing

The Probation Office prepared a Presentence Investigation Report ("PSR") ahead of sentencing. The PSR assigned to Mr. Dias a base offense level of 17. It applied a two-level enhancement for the possession of a dangerous weapon, bringing Mr. Dias's adjusted offense level to 19. The PSR determined that Mr. Dias had a criminal history score of 17, resulting in a criminal history category of VI. Based on a total offense level of 19 and a criminal history category of VI, Mr. Dias's Guidelines imprisonment range was 63 to 78 months.

Mr. Dias objected to the PSR's calculation of his offense level. The district court overruled the objection and adopted the PSR.

At sentencing, Mr. Dias requested a sentence within the Guidelines range of 63 to 78 months' imprisonment. The Government requested an upward variance to the statutory maximum of 180 months. It urged the court to consider Mr. Dias's "significant criminal resume" and the serious conduct underlying the offense, which "could have easily [resulted in] a homicide or a fatality." *Id.* at 177.

The district court determined that "a sentence above the guideline range is necessary to accomplish the statutory purposes of sentencing." *Id.* at 182. In reaching this conclusion, the court stated that it considered the factors set out in 18 U.S.C. § 3553(a). It specifically explained how some of the factors applied to Mr. Dias's

9

case. With respect to "the nature and circumstances of the offense and the seriousness of it," the court explained that breaking into someone's residence while armed and then "squeezing off a couple of shots to cover his exit from the premises" were "plainly serious circumstances that require the imposition of a meaningful sentence." *Id.* at 179–80. With respect to "the history and characteristics of the defendant," the court emphasized that Mr. Dias had "not only a lengthy criminal history," "but perhaps, more significantly, he's got multiple prior convictions for essentially the same conduct that he was doing here." *Id.* at 180–81. Specifically, because Mr. Dias had multiple prior convictions for burglary and being a felon in possession of a gun, the court reasoned that Mr. Dias's conduct here was "essentially recidivist conduct that, in my view, makes it more serious and justif[ies] a more substantial sentence." *Id.* at 181. The court also noted that "[t]he need for deterrence is obvious," because Mr. Dias's "tendency toward burglary and other criminal activity hasn't been dissuaded by what's happened to him in prior circumstances." *Id.*

The court concluded that an above-Guidelines sentence was warranted based on its "consider[ation] [of] all of the statutory factors here that are in [§] 3553 against the backdrop of the conduct and the defendant's history." *Id.*

The district court sentenced Mr. Dias to 120 months' imprisonment, to be followed by three years of supervised release. This appeal followed.

## II.    DISCUSSION

Mr. Dias raises four issues on appeal. First, he argues the district court reversibly erred by admitting evidence of his prior conviction for being a felon in

possession of a firearm. Second, he argues the evidence admitted at trial was insufficient to support his conviction beyond a reasonable doubt. Third, he disputes the substantive reasonableness of his sentence. Fourth, and finally, he argues that § 922(g)(1) is facially unconstitutional under the Second Amendment. We consider each of his arguments in turn.

### A.    Admission of Rule 404(b) Evidence

To support a conviction for being a felon in possession of ammunition, the Government had to prove that Mr. Dias: (1) knowingly possessed ammunition; (2) had been convicted of a felony before he possessed the ammunition; (3) knew he had been convicted of a felony before he possessed the ammunition; and (4) possessed ammunition that had previously traveled in interstate commerce. *See Rehaif v. United States*, 588 U.S. 225, 227–31 (2019). The parties stipulated to each element except the first: whether Mr. Dias knowingly possessed ammunition.

To prove that Mr. Dias possessed the ammunition knowingly, the district court allowed the Government to present evidence of Mr. Dias's prior conviction for the same crime. Specifically, the district court allowed the following testimony from Detective Grimes to be elicited on direct examination:

> Q. Are you familiar with a 2019 State of Oklahoma conviction for felon in possession of a firearm?
>
> A. Yes.
>
> Q. Who's the defendant in that?
>
> A. Mr. Dias.
>
> Q. So he was convicted of that in 2019?

A. Yes.

ROA Vol. 3 at 109. The Government asked no additional questions about the conviction nor made any other references to it for the remainder of the trial.

Mr. Dias himself made two mentions of the 2019 conviction. First, on cross examination of Detective Grimes, Mr. Dias's counsel asked him whether Mr. Dias pleaded guilty to his 2019 conviction, to which Detective Grimes responded "yes." *Id.* at 113–14. Second, Mr. Dias referenced the conviction once in his closing argument, stating "[w]e're not here about something that happened back in 2019." *Id.* at 140.

The district court admitted evidence of the 2019 conviction, over Mr. Dias's objection, under Rule 404(b). Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2).

We apply a four-part test to determine whether evidence is properly admissible under Rule 404(b). *United States v. Irving*, 665 F.3d 1184, 1211 (10th Cir. 2011). Under this test, we evaluate "(1) whether the evidence is offered for a proper purpose, (2) whether the evidence is relevant, (3) whether the probative value of the evidence is substantially outweighed by its prejudicial effect, and (4) whether a limiting instruction is given if the [party] so requests." *Id.*

12

The district court admitted the evidence of the 2019 conviction to show knowledge, a purpose identified in Rule 404(b)(2). And the court gave the jury a limiting instruction stating that the jury may consider Mr. Dias's prior conviction "only as it bears on the defendant's intent and/or knowledge and for no other purpose. Of course, the fact that the defendant may have previously committed an act similar to the one charged in this case does not mean that the defendant necessarily committed the act charged in this case." ROA Vol. 1 at 125.

Focusing on the second and third requirements for admission of Rule 404(b) evidence, Mr. Dias argues that the district court erred in admitting evidence of his 2019 conviction under Rule 404(b). At oral argument, the Government conceded that the district court erred in admitting evidence of Mr. Dias's prior conviction. We agree.

The district court relied primarily on *United States v. McGlothin*, 705 F.3d 1254 (10th Cir. 2013), to support its conclusion that Mr. Dias's prior conviction was admissible to show knowledge. In that case, the defendant, Mr. McGlothin, was charged with being a felon in possession of a firearm after officers searched an apartment in which he was staying with others and found a loaded gun in one of the bedrooms. *Id.* at 1257. Mr. McGlothin planned to argue that "the gun did not belong to him and he did not have the power to exercise dominion and control over" it. *Id.* at 1264. Accordingly, the government gave notice that it intended to introduce evidence of two prior instances in which the defendant possessed a handgun to show the defendant's "identity as the knowing possessor" of the firearm. *Id.* at 1257. The

district court admitted the prior act evidence under Rule 404(b) over the defendant's objection, and we affirmed. *Id.* at 1258, 1262–63. Relying on an earlier Tenth Circuit case, *United States v. Moran*, 503 F.3d 1135 (10th Cir. 2007), we held "when a defendant places his intent at issue, the defendant's prior acts of weapon possession are relevant for the proper purpose of demonstrating the charged act of firearm possession was knowingly undertaken." *McGlothin*, 705 F.3d at 1263. Applying that logic to the defendant's case, we found that the defendant's prior instances of possession made it more probable that the gun found in the bedroom belonged to him. *Id.*

Likewise, in *Moran*, we held that a defendant's prior felon-in-possession conviction was relevant to show knowledge in a case where it was disputed whether the defendant constructively possessed a firearm. 503 F.3d at 1144–45. In that case, officers pulled over the defendant, Mr. Moran, and found a rifle in the SUV he was driving. *Id.* at 1144. Mr. Moran was charged with possessing a firearm as a felon, and his defense was that "he did not know the rifle, which belonged to his girlfriend, was in the SUV, his girlfriend's car." *Id.* The district court allowed evidence of Mr. Moran's prior felon-in-possession convictions to come in under Rule 404(b) on the basis that the evidence was "probative to demonstrate that Mr. Moran 'knowingly' possessed the firearm," an element that was in dispute because Mr. Moran "denied knowledge of the rifle in the car." *Id.* "In other words, the fact that Mr. Moran knowingly possessed a firearm in the past supports the inference that he had the same knowledge in the context of the charged offense." *Id.*

14

But the logic of *McGlothin* and *Moran* does not apply equally to felon-in-possession cases in which the government alleges that the defendant actually possessed a firearm. That is because in these cases, knowledge of the firearm is not at issue. The Third Circuit case, *United States v. Caldwell*, 760 F.3d 267 (3d Cir. 2014), is illustrative. In that case, the defendant, Mr. Caldwell, was charged with being a felon in possession of a firearm after police officers testified that they saw him holding a gun behind the back of his companion, Mr. Tigney. *Id*. at 271. Mr. Caldwell's defense at trial "was that [Mr.] Tigney—and only [Mr.] Tigney—possessed the gun on the evening of his arrest," and that Mr. Caldwell was holding a cell phone, not a gun, in his hand when he was stopped by the police. *Id.* at 272. Mr. Caldwell conceded that "[w]hoever possessed [the gun] knew it." *Id.* at 279 & n.8. Thus, the issue at trial was who had actually possessed the gun—Mr. Caldwell or Mr. Tigney. *See id.* at 272–73. Nevertheless, the government sought to introduce evidence of Mr. Caldwell's prior felon-in-possession conviction under Rule 404(b) to show "knowledge and absence of mistake or accident." *Id*. at 273. The district court admitted the evidence under Rule 404(b) to show knowledge and intent, and the Third Circuit reversed. *Id.* at 273–74, 278.

The Third Circuit observed that in felon-in-possession prosecutions, the government can show guilt "in two ways: (1) by showing that the defendant exercised direct physical control over the weapon (actual possession), or (2) by showing that he exercised dominion or control over the area in which the weapon was found (constructive possession)." *Id.* at 278. It explained that when the government

15

relies on a theory of actual possession, "a defendant's knowledge is almost never a material issue . . . Indeed, absent unusual circumstances (such as when a defendant claims he did not realize the object in his hand was a gun), the knowledge element in a felon-in-possession case will necessarily be satisfied if the jury finds the defendant physically possessed the firearm." *Id.* at 279. Because such circumstances were not present, the Third Circuit concluded that the district court erred in admitting the evidence under Rule 404(b). *Id.* at 282–82.

Other circuits that have considered this question have come to the same conclusion. *See United States v. Linares*, 367 F.3d 941, 950–51 (D.C. Cir. 2004) (holding that the defendant's prior felon-in-possession conviction was not admissible under Rule 404(b) because "no reasonable jury could have concluded that the defendant possessed a firearm either unknowingly or mistakenly"); *United States v. Jones*, 484 F.3d 783, 790 (5th Cir. 2007) (holding that the defendant's prior felon-in-possession conviction "was not relevant to proving actual possession" and therefore not admissible under Rule 404(b)).

Although we have not yet had occasion to adopt this rule, we see no reason to depart from our sister circuits. For evidence to be relevant, it must have a tendency to make a fact "of consequence" "more or less probable than it would be without the evidence." Fed. R. Evid. 401. But where a § 922(g)(1) prosecution is based on a theory that the defendant actually possessed a firearm (or ammunition), knowledge is almost never at issue. The jury will either believe that the defendant held a firearm, or it will not; but, absent unusual facts, the jury will not have a rational basis to

16

believe that the defendant held a gun *unknowingly*. Thus, in these cases, a prior felon-in-possession conviction seems to be relevant only for one purpose: to show that because the defendant knowingly possessed a firearm in the past, he was more likely to have knowingly possessed the firearm on the date of his arrest. But this is precisely the type of propensity-based inference that is prohibited under Rule 404(b).

Here, there are no facts that put Mr. Dias's mental state at issue. The Government presented testimony that Mr. Dias held and discharged a firearm on the date of the arrest. Mr. Dias did not offer a separate defense and instead relied on the Government's inability to meet its burden of proof. Thus, the jury could find either that the Government met its burden of showing that Mr. Dias held and discharged a firearm or that the Government did not make that showing. But the jury would have no rational basis to conclude Mr. Dias held the firearm (and ammunition) unknowingly. Thus, although Mr. Dias's prior conviction may be relevant to the fact of Mr. Dias's mental state, his mental state was not a fact of consequence in this case. *See* Fed. R. Evid. 401. Accordingly, the district court abused its discretion in admitting the prior conviction under Rule 404(b) because the evidence was not relevant.

That conclusion, however, is not the end of our analysis. "Even when the trial court abuses it[s] discretion in admitting Rule 404(b) evidence, we will not reverse a defendant's conviction on that basis if the error was harmless to the defendant." *United States v. Poterbin*, 162 F.4th 1254, 1261 (10th Cir. 2025) (internal quotation marks, brackets, and ellipses omitted). An error "is harmless unless it had a

17

substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." *United States v. Jean-Pierre*, 1 F.4th 836, 843 (10th Cir. 2021). "The government bears the burden of showing the error was harmless by a preponderance of the evidence." *Id.* "To make this assessment, we review the entire record de novo, examining the context, timing, and use of the erroneously admitted evidence at trial and how it compares to properly admitted evidence." *United States v. Kupfer,* 797 F.3d 1233, 1243 (10th Cir. 2015) (internal quotation marks omitted). "[T]he probative value of the erroneously admitted evidence and the overall strength of the other evidence against the defendant are critical factors in the harmless-error analysis." *United States v. Blechman*, 657 F.3d 1052, 1069 (10th Cir. 2011).

Here, the district court's erroneous admission of Mr. Dias's prior conviction under Rule 404(b) was harmless. First, the evidence supporting Mr. Dias's conviction was uncontroverted. *See Poterbin*, 162 F.4th at 1262 (holding that any error in admitting Rule 404(b) evidence was harmless because "there was a significant amount of other evidence presented at trial to support" the conviction). B.A. testified that he saw Mr. Dias pull out a gun and then heard him discharge it. B.A.'s version of events was consistent with the accounts he provided to the 911 dispatcher and to Officer Howard when he arrived at the scene. It was also corroborated by video evidence. B.A.'s cellphone video captured the encounter between B.A. and Mr. Dias inside B.A.'s home and showed B.A. following Mr. Dias outside as the two

18

exchanged verbal threats. Just before the video abruptly ends, the video shows Mr. Dias's hand near his right hip.[3]

Physical evidence, although minimal, also supports B.A.'s account. Officers recovered an untarnished shell casing in the parking lot that appeared to have been recently fired, and no other firearm incidents had been reported in the area in the previous six months. The position of the shell casing on the ground suggested that the firearm was pointed toward B.A.'s apartment at the time it was fired. And B.A. testified he was running toward his apartment when he heard the gunshot.

Mr. Dias attempts to undermine the evidence of conviction by arguing that B.A., rather than Mr. Dias, fired the gun. But none of the evidence he identifies establishes that B.A. was in fact the shooter. For example, as evidence that B.A. fired the gun, Mr. Dias points to B.A.'s "suspicious[]" statement to the 911 operator that he "wanted to report the incident just in case one of [his] neighbors called up and said [he] was over here shooting," Suppl. ROA Vol. 1, Ex. 1 at 1:55–2:00, and B.A.'s statement to his neighbor that "someone shot at him, not the other way around." Reply Br. at 5; *see also* Suppl. ROA Vol. 1, Ex. 2 at 4:30–4:45. But these statements do not reasonably support the inference that it was B.A., rather than Mr. Dias, who possessed the firearm. The neighbor's comment in the video is unintelligible, and no witness testified at trial that B.A. possessed or discharged a firearm. Moreover,

---

[3] In the video, the view of Mr. Dias's hand is blocked by the other items in his arms. However, the placement of Mr. Dias's hand at the end of the video is consistent with B.A.'s trial testimony that Mr. Dias pulled a gun from his right side, causing B.A. to stop recording and run away.

B.A.'s statement to the 911 operator and his neighbor are readily explained by his stated desire to avoid "get[ting] in trouble" for his altercation with Mr. Dias. ROA Vol. 3 at 32.

Mr. Dias also points to B.A.'s aggressive demeanor toward Mr. Dias as evidence that B.A. was the one who fired the gun. At most, however, this evidence is inconclusive. B.A.'s threatening conduct toward Mr. Dias is not affirmative evidence that B.A. was armed, nor is it inconsistent with B.A.'s version of events. Indeed, a reasonable factfinder could infer from B.A.'s aggressive demeanor toward Mr. Dias that if he had a firearm, he would have brandished it while trying to eject Mr. Dias from the apartment. Further, the jury could have reasonably inferred that it was B.A.'s continued aggression in driving Mr. Dias from the premises that prompted Mr. Dias to use a firearm to defend himself against B.A.

Finally, Mr. Dias notes that B.A. initially told an officer that the weapon was fired in the grassy area several car lengths from where the shell casing was ultimately found. But B.A. consistently reported that he was running away when Mr. Dias fired the gun. Thus, he could not see precisely where Mr. Dias was located when the shots were fired and this purported inconsistency does little to weaken the overall strength of B.A.'s testimony that he saw Mr. Dias with gun in hand.

In sum, the Government presented eyewitness testimony from B.A. that Mr. Dias held and discharged a firearm. B.A.'s testimony was supported by video and physical evidence. In contrast, the jury heard no evidence supporting Mr. Dias's

alternative account of events. The strength of the Government's evidence against Mr. Dias therefore weighs in favor of a holding of harmless error.

Additionally, the prior conviction evidence played a limited role at trial. During Mr. Dias's two-day trial, the Government asked about the fact of the prior conviction only once. It did not elicit details of the conviction or highlight similarities between the prior conviction and the instant case. Nor did the Government reference the conviction at all in its opening statement or closing argument. The minor role the evidence played at trial supports the conclusion that the error was harmless. *See Poterbin*, 162 F.4th at 1262 (holding that any error in admitting Rule 404(b) evidence was harmless because "[t]he challenged Rule 404(b) evidence played only a minor role at trial and the prosecutor did not refer to it at all in closing arguments"); *see also United States v. McCallum*, 584 F.3d 471 (2d Cir. 2009) (finding harmless error where "the government did not draw undue attention to the prior convictions, omitting as it did any discussion of the convictions in its summation or rebuttal"); *United States v. Tarver*, 667 F. App'x 304, 305 (11th Cir. 2016) (finding harmless error in part because "the government did not mention [the defendant's] prior conviction in its opening statement or closing argument").

Mr. Dias counters that in *United States v. Commanche*, 577 F.3d 1261 (10th Cir. 2009), we concluded that the erroneous admission of Rule 404(b) evidence was not harmless even though the government did not mention the evidence in its closing argument. But *Commanche* is distinguishable. There, the defendant, Mr. Commanche, was charged with aggravated assault after injuring two men with a

box cutter, and he asserted self-defense. *Commanche*, 577 F.3d 1261. Because it was undisputed that Mr. Commanche was attacked first, the case turned on whether the his use of force was reasonable. *Id.* at 1263, 1269. The district court allowed the government to introduce evidence of Mr. Commanche's two prior convictions for aggravated battery, both of which involved the use of sharp cutting objects. *Id.* at 1263–64. We reversed, finding the evidence was not harmless. *Id.* at 1269–70. We reasoned that even though the government did not mention the evidence in its closing argument, "when faced with the single disputed issue in the case—self defense—the jury could not escape[] the clear articulation that [Mr.] Commanche was a violent and aggressive person who was merely repeating that tendency." *Id.* at 1269–70.

The present case is materially different. Unlike in *Commanche*, the Government here did not elicit detailed evidence about the prior conviction or highlight its similarities with the present case. Thus, the propensity inference in this case was not as powerful as the one that concerned us in *Commanche.* Moreover, in *Commanche*, the trial hinged entirely on whether the defendant's fear and use of violence were reasonable, questions that inherently implicated the defendant's disposition toward violence. Here, the question of whether Mr. Dias possessed ammunition does not implicate character to the same degree.

Finally, the district court gave thorough instructions limiting the jury's consideration of this Rule 404(b) evidence, which further weighs in favor of harmlessness. *See United States v. Merritt*, 961 F.3d 1105, 1118 (10th Cir. 2020) ("When the evidence against a defendant is overwhelming, an erroneous admission of

22

. . . convictions is harmless—especially when the trial court issues a proper limiting instruction." (internal quotation marks omitted)).

In sum, any error in admitting Mr. Dias's prior conviction under Rule 404(b) is harmless. In light of the other evidence of Mr. Dias's guilt, the limited role the Rule 404(b) evidence played at trial, and the limiting instruction given to the jury, "the challenged Rule 404(b) evidence did not have a substantial influence on the outcome, nor does it leave us in grave doubt as to whether it had such effect." *United States v. Summers*, 147 F.4th 1135, 1146 n.6 (10th Cir. 2025) (internal quotation marks omitted). We therefore reject Mr. Dias's argument that the district court reversibly erred by admitting evidence of his prior conviction.

### B.    *Sufficiency of the Evidence*

Next, Mr. Dias claims the Government failed to present sufficient evidence to support his conviction. "We generally review challenges to the sufficiency of the evidence de novo to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Leffler*, 942 F.3d 1192, 1195–96 (10th Cir. 2019) (quotation marks omitted). "Sufficiency review is highly deferential." *United States v. Goldesberry*, 128 F.4th 1183, 1191 (10th Cir. 2025) (internal quotation marks omitted). "It is the responsibility of the jury— not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id.* (quotation marks and brackets omitted). Thus, "[w]hen we review the sufficiency of evidence, we will not weigh conflicting evidence or second-guess the

fact-finding decisions of the jury." *Id.* (internal quotation marks and brackets omitted).

Mr. Dias's main contention is that the evidence at trial was insufficient to meet the Government's burden because "[t]he evidence that Mr. Dias, rather than B.A., possessed the firearm came almost exclusively from B.A.," whose testimony was unreliable. Appellant's Br. at 27. In support of this argument, Mr. Dias points out several alleged inconsistencies in B.A.'s testimony, which he argues cast doubt on B.A.'s version of events. And, setting aside B.A.'s testimony, Mr. Dias contends that the remaining evidence here was insufficient to convict Mr. Dias.

Mr. Dias's arguments fail, however, because they require us to weigh a witness's credibility. "[C]redibility determinations are the province of the jury and are virtually unreviewable on appeal." *United States v. Bass*, 661 F.3d 1299, 1307 (10th Cir. 2011) (internal quotation marks omitted). Indeed, we cannot disregard testimony unless it is "unbelievable on its face—that is, if it asserts facts that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature." *Id.* (internal quotation marks omitted). Pointing to "some minor inconsistencies in [B.A.'s] testimony" does not suffice to meet this demanding standard. *United States v. Pearson*, 798 F.2d 385, 387 (10th Cir. 1986).

At trial, B.A. testified that he saw Mr. Dias pull out a gun and heard him discharge the gun once or twice. Police officers recovered a recently fired shell casing in that same area, and the position of the shell casing suggested that the gun was pointing toward B.A.'s apartment when it was fired, consistent with B.A.'s

testimony. The jury watched a video of the confrontation that was consistent with B.A.'s testimony, as well as body camera footage and a 911 recording showing that B.A.'s story remained consistent over time. Viewing this collective evidence in the light most favorable to the Government, a reasonable jury could find beyond a reasonable doubt that Mr. Dias possessed ammunition.

Mr. Dias resists this conclusion, arguing that the evidence was insufficient to meet the Government's burden because "at best, it established that Mr. Dias *might* have possessed a firearm, but it was equally probable that B.A. possessed and fired the weapon." Reply Br. at 9. True, we have said that when the evidence in the record "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," "we must reverse the conviction because under these circumstances a reasonable jury must necessarily entertain a reasonable doubt." *Goldesberry*, 128 F.4th at 1193 (internal quotation marks omitted). But this rule has no application here, where the Government presented *direct* evidence that Mr. Dias possessed a firearm.[4] *See id.*

Accordingly, we reject Mr. Dias's challenge to the sufficiency of the evidence against him.

---

[4] In *United States v. Goldesberry*, 128 F.4th 1183 (10th Cir. 2025), no testimony supported the government's theory on mens rea. 128 F.4th at 1199-1200. Indeed, the alleged victim's testimony corroborated the defense position. *Id.* at 1201. Here, B.A. testified that he saw Mr. Dias with the gun in his hand and heard the shot or shots fired.

### C.    Substantive Reasonableness

Mr. Dias contends that the 120-month sentence imposed by the district court was substantively unreasonable because (1) the court relied on impermissible factors, and (2) the sentence created unwarranted sentencing disparities.

"Reasonableness review is a two-step process comprising a procedural and a substantive component." *United States v. Jackson*, 82 F.4th 943, 949 (10th Cir. 2023) (quotation marks omitted). The procedural reasonableness inquiry focuses on "whether the district court committed any error in calculating or explaining the sentence," while the substantive reasonableness inquiry asks "whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Cookson*, 922 F.3d 1079, 1091 (10th Cir. 2019) (quotation marks omitted).

"This court reviews the substantive reasonableness of a district court's sentence for abuse of discretion, giving substantial deference to the district court's application of § 3553(a) factors to the facts of the case." *United States v. Maldonado-Passage*, 56 F.4th 830, 842 (10th Cir. 2022). In reviewing the sentence, "we do not reweigh the sentencing factors; rather, we ask whether the sentence fell within the range of rationally available choices that the facts and law at issue can fairly support." *United States v. Miller*, 978 F.3d 746, 754 (10th Cir. 2020) (internal quotation marks omitted). "Of course, the district court need not afford equal weight to each § 3553(a) factor, and we will defer on substantive-reasonableness review not only to a district court's factual findings but also to its determinations of the weight

26

to be afforded to such findings." *Cookson*, 922 F.3d at 1094 (internal quotation marks omitted). We reverse only if "the sentence exceeded the bounds of permissible choice, such that the sentence is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Gross*, 44 F.4th 1298, 1302 (10th Cir. 2022) (internal quotation marks omitted).

1.      **Reliance on Impermissible Factors**

Mr. Dias argues his sentence is substantively unreasonable because the district court relied on factors already "taken into account" by the Guidelines in imposing a 42-month upward variance. In particular, he contends the district court erred by relying on "the circumstances of the offense, that is, that Mr. Dias was convicted of possessing ammunition . . . while perpetrating a burglary, and on Mr. Dias' criminal history," both of which were considered in calculating his Guidelines range. Appellant's Br. at 35.

This argument is unavailing. We have said that "district courts are . . . allowed to contextually evaluate each § 3553(a) factor, including those factors the relevant guideline(s) already purport to take into account, even if the facts of the case are less than extraordinary." *United States v. Smart*, 518 F.3d 800, 808 (10th Cir. 2008). For instance, in *United States v. Lucero*, 130 F.4th 877, 884 (10th Cir. 2025), we rejected the defendant's argument that the district court erred by focusing too much on factors that were already "accounted for by the Guidelines," including the relevant conduct and the defendant's prior criminal history. We explained, "[u]nder current precedent, district courts have broad discretion to consider particular facts in fashioning a

27

sentence under 18 U.S.C. § 3553(a), even when those facts are already accounted for in the advisory [G]uidelines range." *Id.* (quotation marks omitted). Thus, Mr. Dias's argument that the district court erred by considering factors already considered by the Guidelines is without merit.

Mr. Dias also claims that the district court's decision to vary upward based on Mr. Dias's "recidivist conduct" was improper because the Guidelines do not "tie the need for longer sentences to similarities between the present offense and prior offenses." Appellant's Br. at 37–38. This argument also fails. We have endorsed this same rationale for an upward variance in several other cases. For example, in *United States v. Mumma*, 509 F.3d 1239, 1245–46 (10th Cir. 2007), we affirmed the district court's imposition of a 48-month sentence—a 36-month upward variance from the Guidelines range of 6–12 months—where the defendant had a long criminal history consisting of "crimes similar to those that she committed in th[e present] case." We reasoned, "Ms. Mumma [wa]s a habitual prevaricator who has not been deterred by her run-ins with state and municipal law or by her appearance in federal court in this case." *Id.*; *see also United States v. Mateo*, 471 F.3d 1162, 1170 (10th Cir. 2006) (holding the district court did not abuse its discretion in imposing a 99-month upward variance because the defendant's criminal history showed a "demonstrated penchant for criminality"); *United States v. Proffit*, 304 F.3d 1001, 1011–12 (10th Cir. 2002) (noting that the defendant's repeated offenses committing the same or similar crimes warranted a higher sentence because of the defendant's potential for recidivism).

28

Accordingly, the district court did not err by considering Mr. Dias's history of similar criminal convictions in the past in imposing an upward variance.

## 2.    Unwarranted Sentencing Disparities

Next, Mr. Dias argues his 120-month sentence is substantively unreasonable because it creates an unwarranted sentencing disparity compared to "defendants with similar records convicted of similar conduct." Appellant's Br. at 38; *see also* 18 U.S.C. § 3553(a)(6). Citing statistics from the U.S. Sentencing Commission's Judiciary Sentencing Information (JSIN) database, Mr. Dias contends that his 120-month sentence far exceeds the average sentence (58 months) and median sentence (63 months) for defendants with a criminal history category of VI and total offense level of 19 sentenced under the aggravated assault guideline, U.S.S.G. § 2A2.2.

However, our precedent makes clear that "we do not require district courts to consult Sentencing Commission data before imposing a sentence, nor do we require district courts to follow national statistics when imposing a sentence." *United States v. Guevara-Lopez*, 147 F.4th 1174, 1188 (10th Cir. 2025). Rather, a district court satisfies its duty to consider potential unwarranted sentencing disparities so long as it correctly calculates the Guidelines range and explains the need for a sentence above that range. *Gall v. United States*, 552 U.S. 38, 54 (2007). So, even where a district court does not explicitly discuss the potential for unwarranted sentencing disparities, it does not abuse its discretion unless it fails to "provide an explanation that justifies the extent of [the significant upward] variance." *Guevara-Lopez*, 147 F.4th at 1188–89; *see also United States v. Barnes*, 890 F.3d 910, 916 (10th Cir. 2018) ("[T]he

court need not rely on every single factor—no algorithm exists that instructs the district judge how to combine the factors or what weight to put on each one.").

Here, Mr. Dias's argument fails because the district court adequately explained its reasons for imposing an above-Guidelines sentence. Specifically, the district court determined "a sentence above the [G]uideline[s] range [wa]s necessary to accomplish the statutory purposes of sentencing," considering factors like the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense and deter criminal conduct. ROA Vol. 3 at 179–82; *see also* 18 U.S.C. § 3553(a)(1)–(2). In particular, it emphasized that Mr. Dias not only carried out a burglary with a firearm, but also discharged the gun while fleeing the scene of the crime. And it also explained at length that an upward variance was warranted because of Mr. Dias's multiple past convictions for "essentially the same conduct that he was doing here." ROA Vol. 3 at 181. It reasoned that Mr. Dias's "essentially recidivist conduct" made the offense more serious and increased the need for deterrence since he "hasn't been dissuaded by what's happened to him in prior circumstances." *Id.* Because the district court adequately explained its upward variance, the JSIN data he cites do not mandate a finding of substantive unreasonableness even if we assume the data are sufficient to show a nationwide disparity. *See Lucero*, 130 F.4th at 891 (McHugh, J., concurring) ("Although the district court's explanation on [the sentencing disparity] issue is deficient, I agree with the majority that the sentence should be upheld . . . [because]

30

Mr. Lucero's conduct implicates several other statutory factors, namely § 3553(a)(1) and (2).").

Accordingly, Mr. Dias has not shown that the district abused its discretion by failing to consider the need to avoid unwarranted sentencing disparities.

\* \* \*

To summarize, the sentence imposed is substantively reasonable. First, the district court did not err by considering factors that were already taken into account in calculating the Guidelines range. Second, the district court did not err by considering the recidivist nature of Mr. Dias's conduct in deciding to vary upwards. And finally, consistent with our precedent, the district court did not err by failing to specifically discuss national statistics when imposing a sentence. For these reasons, we affirm the district court's imposition of a 120-month sentence.

### D.    *Second Amendment Challenge*

Mr. Dias argues for preservation purposes only that 18 U.S.C. § 922(g)(1) is facially unconstitutional. As he acknowledges, this argument is foreclosed by Tenth Circuit precedent. *See Vincent v. Bondi*, 127 F.4th 1263, 1265–66 (10th Cir. 2025). We agree.

### III.    CONCLUSION

For the reasons explained herein, we AFFIRM in full the district court.

31